Our final case is 24-1154, Guandique-De Romero v. Bondi. Ms. Hogarth, you have an introduction. Good morning, and may it please the Court. Sarah Hogarth for Petitioners. And I will be turning the case over for argument to Ms. Shapiro. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Sarah Shapiro, and I'll be representing the petitioners, Ms. Guandique-De Romero, and her children today. In representing Ms. Guandique in her immigration proceedings, her former lawyer, Mr. Poderak, failed to investigate and submit highly material evidence of sexual extortion, failed to prepare either himself or Ms. Guandique for the merits hearing, and advanced an off-the-cuff particular social group that was plainly not cognizable, despite multiple strong alternatives. Mr. Poderak's conduct constitutes ineffective assistance of counsel because his representation fell far below prevailing professional standards and plainly prejudiced Ms. Guandique. The BIA erred in denying Ms. Guandique's motion to reopen, and this Court should grant the petition for review, vacate the Board's decision, and remand for further proceedings. I welcome the Court's questions. Is that the end of your argument, or do you mean? I can start by discussing the various ways in which Mr. Poderak rendered ineffective assistance. Talk about that particular social group. That sounds like an interesting way to start this case. I mean, he did, in fact, counsel below, identify a social group that appears as though our precedent is not supportive of, and did not advance at least a couple that may have been supportive. Yes, Your Honor, exactly. The PSG that Mr. Poderak advanced was El Salvadoran citizens whose spouses are gainfully employed in the United States. That PSG was plainly not supported by precedent in this Court's case law and by the BIA because it included the amorphous wealth-based component of gainful employment. This Court in Lozama held that wealth-based PSGs are not cognizable, as did the BIA in matter of AME. And further, that PSG is not even arguably cognizable under the three factors set out in matter of MEVG. It is not immutable. It lacks particularity. And Mr. Poderak presented no evidence of social distinction. Further, Mr. Poderak advanced this PSG on the spot without any foresight or preparation. And I would encourage Your Honors to look at the transcript of the merits hearing, which is at JA-488 to JA-489. Your Honors will see that Mr. Poderak admitted to the immigration judge that he was advancing the first PSG that he could think of. He ultimately confirmed a different formulation, and then when BHS counsel pointed out the discrepancy, he walked it back to the original PSG, simply saying that either PSG, that that original PSG was fine with him. So if we are to agree with you that Mr. Poderak, his representation was ineffective, I think the second step you have to be able to prove is prejudice. And so tell me how you're able to do that. Yes, Your Honor. So first, the standard for prejudice should be a reasonable probability that before Mr. Poderak's errors, Ms. Guandique would have been able to obtain asylum. So we have two theories on how Ms. Guandique could have had a reasonable Can I stop you there? So why is that the test and not simply whether or not the hearing was fundamentally fair? So, Your Honor, the prejudice, the whether Is there a difference? I mean, is there a difference? Your Honor, I think that the ineffective assistance of counsel analysis has two prongs. I think the Court and the BIA have at times used the language of whether the hearing was fundamentally unfair. But I understand that that determination encompasses the two prongs of the analysis. First, whether counsel's performance was deficient. And second, whether the applicant was prejudiced by that deficient performance. The standard, it should be reasonable probability here in line with decisions by this court, recognizing that when there are due process violations in immigration proceedings, the proper standard for actual prejudice is a reasonable probability. This comports with the weight of the circuits and the BIA's cases, which recognize the reasonable probability standard for prejudice determinations. And it also makes sense in the context of ineffective assistance of counsel claims, because the nature of the ineffective assistance in many of these cases is such that the underlying record is infected by ineffectiveness. There seems to be an initial question. The standard that we ought to employ for these type of cases, is that the Strickland standard or is it the Fifth Amendment standard? Some circuits have gone one way and others, at least one, have gone the other way on it. The question is what should the Fourth Circuit do? Because we've not squarely answered that question. But it is fundamental to make that determination from the beginning of how are we proceeding on this in terms of the standard for the view for ineffective assistance of counsel. Yes, Your Honor. I think it would be appropriate for the Fourth Circuit to adopt the Strickland standard, recognizing that the two prongs in that context are prongs that this court is familiar with and is able to determine whether counsel performance fell far below prevailing professional standards and whether there was actual prejudice. I think the court can incorporate the test for ineffective assistance in this context without necessarily incorporating all of its Sixth Amendment case law in its entirety. So this court can recognize that there may be some decisions by counsel or some actions that are objectively unreasonable in the criminal defense context but might be reasonable in the immigration context. Can I take you back to the BIA's decision? And what I'm wondering is whether or not we have a procedurally sufficient decision on which to review. And by that I mean we have cases that indicate that in the administrative context it's important for the adjudicator to show his or her work. And so in this context, I wonder whether you agree or disagree that at least with respect to the first prong of ineffective assistance of counsel and maybe both, that the decision in here is simply deficient. It just simply recites a legal standard. It says that the tactical decision of counsel in this case was not ineffective and that's it. I mean, why is that a sufficient decision in this context? I think the immigration judge would have had to explain why the – why counsel was – why that decision was tactical in the context of this record. And I think the same applies to the prejudice analysis. They're just legal conclusions. Yes, Your Honor. We certainly agree that the BIA's decision was deficient here. The BIA rendered a conclusory legal conclusion that Mr. Podorek's conduct was not deficient without explaining why that was the case. And its analysis on the prejudice prong is also lacking. It engaged in legal error by conflating the harm that Ms. Guandique would suffer with the legal requirements for nexus, and it failed to actually explain its prejudice analysis as well. The reason we think that this Court can still remand to the – to the BIA with instructions to remand directly to the immigration judge is that this Court can review the ineffective assistance claim de novo based on the undisputed facts in the record before it. As this Court recognized in Figueroa, this is the sort of mixed question of fact and law that the Court reviews de novo, so the Court can make a determination about whether the BIA legally erred in applying the law governing ineffective assistance of counsel to the undisputed facts in the record here. So in other words, you don't think there's any – that it would be at all helpful for the Court simply to remand and ask the BIA to start all over again? I think the Court certainly can do that if the Court would prefer that the BIA explain its reasoning more thoroughly. I'm simply saying that the Court has all of the undisputed facts in the record before it on which to base its determination. Specifically, the Court has a number of pieces of evidence in the record that demonstrate that nothing about Mr. Podorek's performance was tactical. With respect to the PSG in particular, there are four, I think, important pieces of evidence that demonstrate that there was no strategy in formulating it. The first is his failure to file a pretrial memorandum of law. While, of course, that's not dispositive, that is some evidence that he did not put in any additional preparation or research in advance of the hearing. The second, of course, is the merits hearing transcript itself where Mr. Podorek admits that he's formulating the PSG on the spot and is, in fact, so unsure about what PSG he's actually formulating that he confirms a different formulation. The third is I'd urge the Court to look at the appeal that Mr. Podorek filed with the BIA. That's at JA-425 to JA-431. In that appeal, although the immigration judge had concluded that the PSG advance was not cognizable, Mr. Podorek makes no effort whatsoever to rehabilitate that PSG. He presents no legal framework for governing the cognizability of PSGs, and he doesn't identify any factors that are used to show cognizability. So if you're going to – if your argument is that we can go ahead and look at this case de novo and assess both prongs, then I guess we need to go back to Judge Benjamin's question about prejudice and, in particular, nexus, because I think that's a real problem for you, given this record. Tell me why that isn't the case. Yes, Your Honor. I think, first, with respect to the family-based PSG, the facts in Ms. Gwandik's case fit like a glove to many of this Court's decisions overturning immigration judge's nexus determinations for being excessively narrow in the immigration context. So, for example, in Ms. Gwandik's original affidavit at JA-527, in her merits hearing testimony at JA-499 and JA-509, and in her most recent declaration at JA-72, she repeatedly confirms that when the gang members first targeted her, they told her that they were targeting her for this extortion because of her husband, because they knew he was in the United States and wanted to use her to get to him. That is quintessentially a nexus determination. Those are quintessential facts that this Court has found shows nexus. Well, how does that show a particular nexus with respect to the husband-court family as opposed to the fact that he was a money pit? Your Honor, that's the kind of nexus determination, that is the kind of analysis the Court would engage in when there are mixed motives in cases, including Hernandez-Avalos, Ian Salgado-Sosa, Zavaleta-Policiano, and cases after 2019, Perez-Vazquez and Hernandez-Cartagena. This Court has repeatedly recognized that when gang members target a family member in order to get at another family member's financial resources, that is a situation that shows nexus to the family PSG, because the only reason that person was targeted and not someone else is because those gang members wanted to use her, in this case Ms. Gwandik, to get to that other family member's financial resources. In Perez-Vazquez and Hernandez-Cartagena, both of those cases involved situations in which family members were in the United States and sending the applicants money, and this Court held that there was nexus to family-based PSGs when the gang members informed the applicant that they were targeting them for those reasons. How are you going to, I guess I'm curious to hear, Initially, the reason I think she said that the husband left was because he was a part of a political party, and because of whatever issues that he was having with the political party is why he left. So it's somewhat inconsistent now, she's saying it's because of the gang. Your Honor, to start, I want to point out that Mr. Poderak never met with Ms. Gwandik in advance of the hearing and never explained to her the legal requirements for asylum and which facts might be legally relevant. Ms. Gwandik explains in her most recent declaration that she was confused and nervous during the hearing, and I think the transcript of the hearing makes that clear. English is not her first language. She was using a Spanish interpreter, and frequently she expressed confusion with the questions she was being asked. I think further, there's no reason that this is inconsistent. It's possible that her husband left El Salvador for multiple reasons, and Ms. Gwandik didn't know which of those reasons might be legally relevant to her asylum claim. But finally, on that point, I think this is the type of situation in which it makes sense to remand for a full hearing. The immigration judge, I will note, did find Ms. Gwandik testified credibly in the first instance, but to the extent that there's any factual confusion, that's the sort of thing it makes sense to remand to the agency to figure out in the first instance. So is it your position that any time a gang member in one of these, in a Central American or South American country, suggests to a victim that if you don't have the money, find a family member who does, that that's a sufficient nexus to warrant asylum protection? No, Your Honor. I think the distinction here is the gang members specifically knew Ms. Gwandik's husband first, and then chose to target... Four years had passed between the initial threat of extortion against her husband and this most recent one. So how do we know that we're talking about the same gang members? I think to start, that's the sort of factual determination, that it would be helpful for the immigration judge to have the opportunity to sort out in the first instance. Except you told me that we didn't need to do that. Well, I think that it does need to go back to the immigration judge for a full hearing. I simply think the BIA doesn't necessarily need to render another decision on the motion to reopen. And I think that that's the sort of factual determination, that had Mr. Poderak fully developed the facts of Ms. Gwandik's case, would be before the immigration judge in the first instance, and the immigration judge would be able to make the determination about whether there's a nexus. I think on the other point, in this Court's cases in Zavaleta-Policiano, in Alvarez-Lagos, this Court has held that timing, while it may be relevant, is not necessarily just positive, particularly when there is evidence that might suggest, that might provide a reasonable explanation for the delay. So, for example, in this case, it's possible that gang members took some time to discover that Ms. Gwandik's husband had left El Salvador. They took some time to identify who his family members were, to find out her phone number and where she lived. There is some evidence in the record that after he fled the country, she spent some time living with her parents in a different part of El Salvador. So all of these factual indeterminacies could be the sorts of things that explain why Mr. Podorek's failure to develop the factual record prejudiced Ms. Gwandik in this case, because it created this sort of factual confusion that prevented her from obtaining asylum on the family-based PSG. All right. Thank you, Ms. Shapiro. Your time is up for right now. Yes, Your Honor. Thank you. Ms. Byrd. Good morning. May it please the Court, Sarah Byrd on behalf of the Respondent, the Attorney General. The Court should deny the petition for review because the Board did not abuse its discretion in denying the motion to reopen the asylum proceedings. You can reach that conclusion on either of two bases, as you've already discussed, finding that there was no due process violation or finding that there was no prejudice. And I'll address those in turn, but I'm happy to jump around. First, as to the due process violation, this does arise under the Fifth Amendment, not the Sixth. So other courts have said that the Strickland – We haven't determined that. You're right. The other circuits have said it arises under the Fifth Amendment. The First Circuit would disagree with you, and we're kind of nowhere in terms of deciding that yet. This Court has found it under Lazada, essentially, found that it's an administrative remedy and declined to reach the position. Initially, the Court found that there was no Fifth Amendment right to effective assistance of counsel because – But we didn't so hold, is what I'm saying. We haven't held that here. Right. The Court initially held there wasn't one, but then it got overturned, vacated, and now it's essentially an open question, except that the Court has applied Lazada, which applies the Fifth Amendment. So the Court has – and a footnote, I believe, in one of your cases said that you didn't need to reach the question because there's this administrative remedy under the board that does apply the Fifth Amendment. And other courts have held that the Strickland test is the – is an initial step. What test do you think the BIA applied here? The BIA applied the Lazada test and the Fifth Amendment, which is to look whether the proceedings are fundamentally fair, and that's the test for whether there was ineffective assistance of counsel. It's not just an objective reasonableness test like Strickland. It's the test for whether there's a due process violation, because a noncitizen in immigration proceedings has a right to due process, is whether the proceedings were fundamentally fair. And then the second step, the prejudice step, looks to whether there's a reasonable probability. And so the fundamentally fair, I believe, Judge – But, look, to me, clearly they applied that – the Fifth Amendment that says when they deny that motion, describe that first problem. They quoted the Sixth Amendment cases on reasonable confidence and not perfect advocacy. Judge would benefit of insight. It's not so clear to me they looked just at Fifth – Fifth Amendment. I believe that the Sixth Amendment cases can help inform whether or not there is a reasonable probability of a different outcome. Absolutely. And I agree with that. I think the prejudice prong for both tests is the same, that it's a reasonable probability. And it's the first prong, the due process prong, that's slightly different. But regardless how you look at it, if you look at it, the individual – the ineffective assistance of counsel, they concluded that it was a tactical decision for – Yes, sir. to do that. What is the tactical decision to advance an argument that is clearly not supported by precedent? Well, Your Honor, I think that I have a couple responses to that. First, the group he proposed had not been previously rejected by controlling case law. Before you get to that, I'm sorry to interrupt. Yes. But you have a couple of responses to that, but the BIA had no response. It just said – stated a legal conclusion. Don't you think that's a problem? I think that the BIA could have done a better job in reaching its conclusion, but it – you can discern its path here because – partly because of the case law that it cites, and partly because proposing a particular social group is almost always a tactical decision. It's the theory of the case. It's trying to take the facts presented by a noncitizen when she comes – first comes before her attorney and tells him why she's afraid to go home. She doesn't know the refugee definition. If it's not on account of race, religion, nationality, or political opinion, then the only theory of the case remaining is particular social group. And so the attorney has to think, well, I have to show a nexus. So I have to – it has to be the reason she was targeted, but I also have to make it a group. And that's always a tactical theory of the case. Well, it appears that he came up with that right there at the hearing. Actually, he didn't present the PSG. I believe the judge asked him, well, what's your PSG? And then he says, I think it's this. And then he comes back and restates it, and it's different from what he said the first time. So I don't even know if that's – I don't know how you can argue that that's a tactical – I mean, that this is something that he came up with. And there is cases over 10 years old that says that you can't use wealth-based things. So I – So those are separate. I don't know how that could be 10. I'll start with the record. I don't think it's necessarily fair to assume that just because he used the word, that's the group I think of, means that he thought of it right there on the spot. He might have thought of that months ago, and he can't think of any other group that fits the facts of his case. No, it's not the problematic word. The problematic word he used was in describing a group gainfully employed. He can't – that kicked him out. Well – It's not whether or not he did it a year ahead or right there on that spot. It's what he actually proposed is something that precedent did not allow. Your Honor, wealth-based groups are clearly not allowed. Someone having been gainfully employed could be a try around it. He had to propose something that was the reason she was targeted. And the gain members – LaSalle is on point. Our case, LaSalle is on point on that, right? Your case – We rejected that when we said, you know, you can't use wealth-based. You can't use wealth, but gainfully employed is slightly different than wealth because it is a more objective means. But I'm not going to – So you're saying in a different case you would stand before us and say that group is okay. I am saying that every group has to be addressed on the facts and circumstances. But you believe this was a cognizable group. No, I do not. I would defend the agency decision. However, Your Honor, that decision is not before you. What I am saying is that even if a group is not cognizable, if that's the reason a noncitizen is afraid, she has the right to apply for asylum. So, for example, deportees. A lot of cases go forward on the group of I'm afraid because I'm a deportee and I will be harmed. That's not a cognizable group, but that person has the right to apply if they're afraid. And it's not necessarily ineffective assistance of counsel to represent someone on a claim that – The problem here is what was advanced. Is it gainfully employed? It seems to be even more immutable than wealth. I mean, when you're talking about it in a general sense. If it were future gainful employment, sure. Past gainful employment? There are actually groups that could have been proposed, very simple ones here, that we've recognized. Your Honor, that's right. And I think whether or not those groups are better is not the question. The question is whether or not she had a fundamentally fair hearing at which to present her reason for her fear. And to the extent that she wishes now to go back and present a different group, it's still the same experiences that she had. But I'm trying – we're talking about ineffective assistance of counsel. A lawyer who stands up and advances a group that for which the precedent says that is not a group, and there are, because you say better, which the law says they are, we're talking about ineffective assistance of counsel. I mean, so – Not under the Fifth Amendment exactly, Your Honor. And also the law had not – there was no controlling case law that had rejected the precise group. I think his group reflects an attempt, perhaps a poor attempt, but an attempt to avoid directly referencing wealth and instead to reference the reason she was being targeted, which was that her husband had gainful employment in the U.S. That's not just saying I'm targeted because I'm wealthy. And yet the nexus, at the end of the day, she was targeted because of access to money. And so if we jump to the prejudice component, Your Honor, the immigration judge even considered the fact that the family ties and says that the gang members viewed her husband as a source of wealth and a means to an end, not something that the gang was attempting to overcome. They were motivated solely by the financial incentive that the group membership, whether cognizable or not, was incidental, tangential, superficial, and subordinate to the financial motive. So even had she proposed a family-based group, we know, because the immigration judge went ahead and told us, that that would have been found in a mixed mode of analysis to be tangential and superficial and not a central reason. Can I ask a question about that? So which decision are we considering on appeal? Is it the immigration judge's decision, the BIA's decision, or both? Both. Well, no, Your Honor. It's only the Board's decision. But the Board does specifically talk about the immigration judge's nexus determination in its prejudice paragraphs. So I think the Board, the tactical decision paragraph goes to whether or not there was ineffective assistance of counsel. And you've expressed that you feel that is somewhat conclusory. But then the next two paragraphs go to prejudice in the Board's decision. And those two paragraphs talk about the immigration judge determined that the gang was motivated by financial incentive and general criminality. And they quote the immigration judge's decision as to the nexus in finding that there was no prejudice. So we're not directly reviewing the nexus determination as you would if it were a direct appeal of the underlying immigration judge and Board decisions on the merits. But instead, we are looking at the nexus determination under the Board's citation to it in its prejudice analysis. Does that answer your question? No, I appreciate that. You know, I do think it's a difficult task for the petitioner, given the facts in the record suggesting that lapse in time and all that. Your Honor, I would like to address that. You mentioned the you brought up the facts in her current affidavit about her husband's supposedly having been extorted by the gang members. But in her testimony, which was under oath, she was asked open-ended questions and specifically testified that no one in her family or friends had been extorted by gang members. She was asked, do you know of anyone who has experienced this extortion? And she said no. And she also claimed that her husband fled because of political problems after he participated in a political campaign. And this is her story. This is her account. So no, she can't blame that on ineffective assistance of counsel. That's her, under oath, providing affirmative testimony that this did not happen to her husband. And now she's saying that it did. So, and that directly contradicts her prior claim and could get – I mean, if he had presented those directly contradictory facts, that would have been an adverse credibility determination potentially. That's – it's not just a new fact that is – enhances the claim. It's also a direct contradiction to what she said under oath. And that – her testimony is also significant with regard to her claims about using gender as a particular social group. That she was asked multiple times open-ended questions that could have had her testify about the threats of sexual extortion. She was asked, was there anything else that they said to you? What else? Tell us more about that call. And she just didn't offer that. And she – I think her argument is that her attorney advised her not to. That is – it's hard to say if that's her argument or not. That seems to be counsel's argument. That is not what her affidavit says. Her affidavit doesn't support that argument. And that's just – it's a very serious claim. That's a violation of Virginia criminal law and ethics violation for counsel to advise her – the client to perjure herself. And her affidavit merely says that he did – she told him about it and he didn't include it in her written asylum application that she filed in 2017, well before her 2019 hearing. So the actual factual evidence does not support that claim. And it wasn't raised in the opening brief, I thought intentionally, because it wasn't supported by the evidence. Subsequently, it seems like perhaps they're saying that, but it's just – it's not in the evidence. And it's a very, very serious allegation to make against an attorney to say that they counseled their client to perjure themselves without any evidence in the record. I don't think it's fair to say that that's what happened. And the Virginia State Bar didn't think so either. They found that it was mere dissatisfaction with his strategy. So I think we need to be very careful to put that aside and look at just what's in her affidavit, which is, I told him about the sexual extortion. He didn't include it in my asylum application. But then at her hearing, he asked these open-ended questions that seem – he can't ask leading questions. So he's asking her, what else did they say? How else did they threaten you? And she had every opportunity to mention it, and she didn't. In the context of the lawyer there, her statement says she told him she had been sexually extorted, and not just financially extorted. And his response is basically, I'm the lawyer. I know what I'm doing. That's right. That's what she said in her affidavit. But that's a far cry from him saying, don't tell the immigration judge that. Lie under oath. Just trying to – who knows? He's trying to reassure her that he's the lawyer. He knows what he's doing. He's doing her asylum application. Which we now know he didn't quite know what he was doing because he had this PS group. It was gainfully employed business in there, and he did not know the other groups that – The problem with the other groups is they wouldn't have satisfied the nexus determination. He had to come up with something that tried to get at the reason why she was targeted, and while this court has subsequent case law that, I would say, changes – See, he doesn't want to hit a nexus with the first one. He's not responsible – The first one is dead on arrival. You see where I'm going with that? I do see where you're going with that. I mean, what kind of tactical decision is that? The first – Let me ask you this. What is our standard of review? The overarching standard of review for the motion to reopen is abuse of discretion, and this Court has applied that even in the context of motions to reopen based on ineffective assistance of counsel. However, this Court's more recent decision, I believe in Williams, makes clear that the subsidiary facts to the – or questions to the extent that there's a pure question of law would be de novo. So abuse of discretion is the standard, but you can look at a subsidiary pure question of law de novo, a factual question for substantial evidence, and a subsidiary mixed question. It would kind of depend on whether it's mixed but predominantly factual or whether it's a legal question. So is an ineffective assistant counsel de novo? Yes, Your Honor. I would say that the pure legal question of whether there was a due process violation is de novo. But any subsidiary – the overarching question is abuse of discretion. I honestly think it's a matter of semantics because even under abuse of discretion, if there's an error of law, that's an abuse of discretion. So I'm not sure that I see a huge difference in this context with ineffective assistance of counsel. To me, there's always a difference between abuse of discretion and de novo. But an error of law – How much difference is given on de novo? I agree, Your Honor. But if the agency made an error of law, then that would be an abuse of discretion. So here, looking at the ineffective assistance of counsel, that – and the due process question is a constitutional legal question that the Court would review de novo. The question as to prejudice would be more of an abuse of discretion question, and the Court would look at the nexus finding. And here, Your Honor, I will reiterate that while there is a hint at the gainfully employed in wealth, that's a past act that's not been previously rejected by controlling precedents. So it was not 100 percent out. It is similar but not the same as what this Court had previously rejected. It's a try at different wording to get at these extortion cases, which are all – this one in particular is very much financially motivated. She had no evidence that they even knew her husband's name, who he was, that they cared at all about his identity. They cared about her access to money. And that's further supported by the fact that they increased the amount of the demand when they found out she was treasurer of a school. It was – the immigration judge thoroughly found that it was all financially motivated. And so these other particular social groups, had he advanced them – it may have been tactical not to because he didn't think they could meet the motive. And again, this is in 2019, before this Court substantially changed its case law regarding nexus and what qualifies as a nexus. So we have to look at it at his perspective then. And – So meaning that we didn't have this mixed motive analysis before then? The mixed motive analysis, certainly it existed under case law and under the agency's case law. But this Court's subsequent decisions, particularly with respect to family and when family is mixed into the motive, have expanded that quite a bit. And so this Court views a central reason differently than the board or any other court and has made it much easier to show a nexus under this Court's case law than it is anywhere else. But that was not the case yet in 2019. That really happened with Perez-Vasquez and Lopez-Benedez. No, Lopez-Benedez is trying to bring that back. But Perez-Vasquez in 2021 is the case that I think is most similar to this one, but it came after the fact. So we can't rely on that. At this point, counsel would have been arguing for an extension of the law, and it's not in effect of assistance of counsel to fail to argue for an  So, Your Honor, I have a little bit of time left if there are any other questions. Thank you very much, Ms. Burr. Thank you. Ms. Shapiro. Thank you, and may it please the Court. So I want to start off by going back to whether this is decided under the Sixth Amendment or the Fifth Amendment standard. While we think the Sixth Amendment standard is appropriate, we think that either way Ms. Guandique has made the requisite showing. Her hearing was rendered fundamentally unfair because Mr. Podorek failed to develop the facts of her case, effectively implicitly instructed her not to include legally relevant evidence, and left her in a legally indefensible position. That's sufficient to undermine the fundamental fairness of her hearing. What is our standard of review? I think the standard of review here is at the end of the day, it's abuse of discretion. But because the only subsidiary issue here is the question that this Court reviews de novo of whether the facts of this case rise to the level of ineffective assistance of counsel, the standard is effectively a de novo review because it's a per se abuse of discretion to misapply the law. So you're saying a de novo review on ineffective assistance of counsel is not only a question of law, but the underlying facts, too? So I think that the BIA did not indicate that it was making any factual findings. The Court has the entire record before it and can make a determination about whether the undisputed facts in the record when the ineffective assistance of counsel standard is applied rise to the level of ineffective assistance. I think if there was any indication that the BIA denied Ms. Guandique's motion for additional discretionary reasons, for example, maybe deciding that for some reason she was not entitled to a favorable exercise of discretion on her asylum claim, that might be a case where the abuse of discretion standard has more effect. But that's simply not the case here. And then I think I want to quickly turn to the discussion the Court was having with Ms. Bird about the nexus determination. Although Ms. Bird points out that Perez-Vazquez was decided in 2021, I do want to note that Perez-Vazquez was decided several months before Mr. Podorek's appeal to the BIA. So had he offered a legally cognizable family-based PSG, he would have been able to rely on that case on appeal. But further, I urge the Court to look at Salgado-Souza and Zavaleta-Policiano. In both of those cases, gangs targeted members of the applicant's family for financial reasons, and when those family members refused to pay, the gang turned and targeted the applicant themselves. There was significant evidence in at least seven precedents spanning nearly a decade leading up to the 2019 merits hearing that supported the cognizability of the family-based PSG, that cautioned immigration judges against making excessively narrow nexus determinations, and that recognized mixed motive analysis in nexus. And were we in a legally defensible position to bring this on direct review, we would have appealed the immigration judge's underlying nexus determination, but we were unable to do so because Mr. Podorek put Ms. Gwandik in a legally indefensible position. And then finally, I just want to go back to all of the government's arguments with respect to any strategy underlying Mr. Podorek's formulation of the PSG. I think the record is clear that there was no strategy whatsoever. I think the Court can see that in his failure to meet with Ms. Gwandik and prepare at all in the transcript of the merits hearing itself and in his appeal to the BIA, alongside the fact that he is one of the rare cases in which the attorney who receives a Lozada complaint does not actually respond and explain their reasoning. I think the record is clear that there was no strategy, and the Court cannot uphold the BIA's erroneous findings, erroneous decision on grounds that the BIA itself did not give. Ms. Shapiro, Ms. Bird, in her argument, if I'm remembering this correctly, said that your client not only didn't mention this issue of familial financial motive but disavowed it in her testimony. What's your response to that? To start, I want to note that twice in the merits hearing and in her original affidavit, she did say that gang members expressly told her that they were targeting her because of her husband. That's consistent with her most recent declaration. Further, the point in the record that I believe Ms. Bird is referring to is at JA-510 to JA-511. This is during DHS counsel's cross-examination at Ms. Wendik, and she demonstrates substantial confusion. She repeatedly says, I don't know. She repeatedly asks the government attorney to repeat questions. Her answers demonstrate that she didn't understand what the question was actually asking, and that is where the statement that Ms. Bird is referring to comes from. Elsewhere in her testimony, she actually says that her sister had been previously extorted by gang members, and the immigration judge, hearing this testimony, found her credible. That credibility determination is at JA-448, and the BIA adopted the immigration judge's findings in full in its initial order and recognized this credibility finding at JA-7 in its decision on the motion to reopen. So the evidence in the record supports the conclusion that Mr. Podorek failed to properly prepare Ms. Wendik to testify. There are other cases in the criminal context, Beemore v. Chappell in the Ninth Circuit is helpful on this point, that show that it is the lawyer's obligation to prepare their client to testify, and that often when the lawyer fails to meet that obligation, the client has a difficult time responding to cross-examination, and I think those difficulties are only exacerbated in contexts such as these when you have a non-citizen whose first language is not English, who is relying on a translator and is confused about the legal requirements governing her claim. Now, if the Court has no more questions, I see my time is almost up, so I will kindly ask the Court to vacate the Board's decision and remand for further proceedings. Thank you very much, Ms. Shapiro. On behalf of the Court, I want to thank you and the Yale Law School for taking on this representation. Needless to say, I think you did a fine job on behalf of your client, and we're very grateful for that. And Ms. Byrd, you as well did a fine job on behalf of the government, so thank you both for your excellent arguments. We'll come down and greet you and adjourn for the day. Mr. Potter, we'll come down after we get back. We'll come back in a minute to talk with you and your group about this morning. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: Albert Diaz, James Andrew Wynn, DeAndrea Gist Benjamin